143 So. 188

## WIGGINS v. STATE.

### 7 Div. 900.

Court of Appeals of Alabama.
June 30, 1932.

Fort, Beddow & Ray, of Birmingham, and Frank B. Embry, of Pell City, for appellant.

Thos. E. Knight, Jr., Atty. Gen., for the State.

Brief did not reach the Reporter.

RICE, J.

Appellant was convicted of the offense of murder in the second degree, and his punishment fixed at imprisonment in the penitentiary for the term of fifteen years.

The specific charge upon which he was tried and convicted was the murder of George Treece, sheriff of St. Clair county.

The testimony upon which the state relied for a conviction was, in essential substance, as given principally by its witness Marshall Owens, as follows:

Treece, the dead man, was sheriff of St. Clair county; Owens, the witness, was a deputy sheriff, under him.

On the night of April 8, 1931, at somewhere between 9 and 10 o'clock, Treece and Owens went, together, to a point near the home of appellant, where they parked the car in which they were riding, in an old side road. They got out and walked to defendant's home, which was situated in the country, some mile and a quarter, or so, from the town of Springville.

This appellant's home was some distance back off the public highway, up on a hillside, with a private road running back from the said public highway, up the hill, and, as we gather, circling around in front of the dwelling house, so that a car or other vehicle coming up the hill from the highway might be driven around this circle, or curve, and returned to the highway in the same path traversed in going up to appellant's front door.

Appellant's garage, as best we can understand from the bill of exceptions, was situated to one side of this private roadway, and facing it, and, placed out to the side or rather in front of the dwelling house.

Upon the occasion here in question, Treece and Owens walked up outside the rear end of appellant's garage (right up against the

garage), in the dark—it being a very dark night—and waited. From their position they had a view, such as the darkness afforded, of the front door, front porch, steps, yard, etc., of appellant's home.

After a few moments of such waiting, a negro appeared at the said front steps and called to "C," shown to be the "nickname," or "short name," by which appellant was known. Appellant came out the front door, conversed a short time with the negro, returned into the dwelling house for a moment, then came out a second time, and walked off into the "woods," passing within ten feet of Treece and Owens, who were, all the while, standing as above noted just immediately behind appellant's garage.

As appellant was leaving this negro, standing there in his front yard, to make the trip to the "woods," the negro was heard by Owens to say he "wanted a whole gallon," and appellant remarked that he "would be back in five minutes."

Appellant went, as stated, within ten feet of Treece and Owens, passing them, traveling on the "upper side" of said garage. He went a short distance in the "open," when he disappeared, for only a short time, into the "woods." Coming back "out of the woods," he passed the garage (and Treece and Owens) traveling on its "lower" (down hill) side. When appellant got, as we understand it, about even with the back end of the garage, on his way out from the "woods," Treece and Owens "walked out on him"—Treece "on the right," and Owens "on the left," and both of them slightly in the rear of appellant. As they so "walked out," Owens, the deputy, the only man to do any talking, said: "All right 'C,' we've got you, give us that liquor." As, or rather immediately after, this was said, both Treece and Owens "cut their lights on," which is interpreted by the witness to mean they (he and Treece) each turned their flash-lights so the light from same would envelop appellant, and which disclosed him carrying a "gallon jug in his left hand and a gun (pistol) in his right hand." Immediately, without a word, according to Owens, appellant "threw up his gun, and began shooting," while neither Treece nor Owens "had their pistols in their hands." Appellant fired six shots, Treece, the dead sheriff, fired two shots, and Owens, the deputy, fired six shots, making a total of fourteen shots, all fired, according to Owens, in the space of some twenty seconds.

As the shooting was in progress, appellant was "angling away," which means he was backing away, in an "angling position," from Treece and Owens. He never "advanced (toward them) an inch." And Owens, about the time the shooting started, advanced, toward appellant, out in front of Treece some few feet. While appellant was shooting, in one place in his testimony, Owens states "he had a gallon of liquor in his left hand," etc., and, in another place he said he couldn't tell "what he had."

When the shooting was over, it was found that Treece was wounded by a pistol shot by a ball that, according to the doctors, "entered his left shoulder and penetrated straight across the body," etc. He died, as the result of this wound. In his "dying statement" he corroborated, in some particulars that do not seem to us so important, the testimony of Owens, the deputy sheriff, hereinabove rather scantily, but we think sufficiently, outlined.

The testimony of appellant was not contradictory of that of Owens, above, in such a great many particulars, though, where it *was* so contradictory, it was of matters vitally affecting his plea of self-defense. For instance, he *admits* that the negro came and called him out; that he had the short conversation with him; that the negro wanted a whole gallon of *whisky*; that he (appellant) went, all as testified to by Owens—except some minor discrepancies, such as whether appellant, as he claims, remained out of the dwelling house all the time from his first coming out, etc., or whether he stepped back inside the front door a moment, as Owens claims, and came out a second time, etc., to the "woods," with his pistol in his hand, and came back, directly, with a gallon jug of whisky, which he was going to "let the negro have," etc.; that he held this gallon jug of whisky in his hand, and all the while the shooting was in progress—throwing it against some rocks and breaking it, near the close of the battle. But appellant states that as he passed the back corner of the garage "coming back" from the "woods," he "heard something start from behind his (my) garage in a run like," but "did not hear a word"; that "as I turned my head the flash-lights hit me and shots went to shooting"; that "there wasn't a word spoken"; that "they (meaning Treece, the dead sheriff, and Owens, the deputy) shot first"; that he (appellant) shot five times, he thought, toward the "flash-lights."

It was without dispute that the officers (Treece and Owens) had no warrant, of any kind; that it was a dark night, no moon; that appellant, himself, was shot in the "flank," a flesh wound, whether from the front or rear could not be said.

We think the above fairly represents the situation giving rise to the rulings of the trial court which we shall discuss.

Appellant's able counsel have furnished us with a carefully prepared, and helpful, brief. None has been filed upon behalf of the state.

While we have discharged our duty, we think, by carefully examining every "question apparent on the record or reserved by

(the) bill of exceptions," as the statute requires, yet we are of the opinion that the only questions necessary to be herein discussed are to be found among those treated in the brief furnished us on behalf of appellant.

Code 1923, § 4643, provides that: "Sheriffs are charged with the duty of being on the alert for violations of any of the prohibition statutes," etc.

The trial judge, evidently with this statute in mind, charged the jury, orally, that: "If George W. Treece and Marshall Owens, the Sheriff and deputy Sheriff, went onto Wiggins (appellant's) premises to watch and see whether or not Mr. Wiggins was violating the prohibition law, they were not trespassers. They had a right to be (there) for that purpose."

■ This portion of said oral charge was made the subject of an exception by appellant. And it was prejudicially erroneous.

As stated above, it was without dispute that neither of the officers was armed with a search warrant, but, rather, each of them with a flash-light, and one of them with a .38 Smith & Wesson six-shooter, and the other with a .44 Smith & Wesson pistol.

No construction has yet been made of the above-quoted, or any other, statute in connection with the prohibition of the possession, sale, etc., of intoxicating, etc., liquors that authorizes the sheriff, or his deputy, or any other officer, to go, in the dark nighttime, on the private premises of any person, under these circumstances, to "watch and see" whether or not said person is violating the "prohibition law." Such conduct is in the very teeth of section 5 of the Bill of Rights of our Constitution of 1901. It is "snooping" of a kind the repulsiveness of which outweighs what might otherwise be the subject of praise, as "zeal in the enforcement of the laws against crime."

We are not sure that the testimony shows, without conflict, that these officers were, as a matter of fact, *upon* the premises of appellant, while "watching," etc., but it certainly gave room to the jury to *find* that they were.

■ This fact, though, is not to say that the trial court was in error in refusing to give to the jury appellant's written, requested, charge No. 24. Moreover, we think, and hold, that this particular written charge was correctly refused as for its being, under the evidence in the case, misleading. If the appellant *was* "in his castle," etc., and if deceased *was* a trespasser, in being upon appellant's premises, etc., without a search warrant, or other right, *still* deceased *was* the sheriff of the county, the chief law enforcement officer, and appellant was, by his own admission, engaged at the moment in a violation of the criminal laws of the state; and we know of no rule of law, and have been cited to none by appellant's able counsel, which would forbid the sheriff, under such circumstances, from discharging the high duty placed upon him of apprehending and arresting, on the spot, the self-confessed, present, violator of the said criminal laws. This written, requested, and refused charge 24 would, it seems to us, have misled the jury into thinking otherwise.

■ All that we have said, above, as to the correctness of the refusal of appellant's written, requested charge 24, applies, and we do so apply it, equally as well to the refusal of appellant's written, requested charge 28.

Appellant's learned counsel sum up their conclusions as to the law of the case by the assertion that, as they view it, under the evidence, the only question to be submitted to the jury was: "Did the defendant (appellant) under the circumstances use more force than was reasonably necessary to repel the unknown trespassers in his yard who turned out later to be the officer(s) of the law?"

This would be a correct conclusion under the *appellant's* testimony. Presley v. State of Florida, 75 Fla. 434, 78 So. 532, L. R. A. 1918D, 975.

But counsel lose sight of the fact that Owens, the deputy sheriff, accosted appellant, Owens says, with the words "All right 'C,' we've got you, give us that liquor"; and that appellant states that he *knew* Owens' voice.

■ If the jury should find, etc., that Owens *did* use the language he ascribes to himself, and appellant heard it, then it was the clear duty of appellant to *submit*—whether to an arrest, or to the surrender of his illegal possession of liquor, etc., matters not. Tranum v. Stringer, 216 Ala. 522, 113 So. 541. To him, it was the voice of the "law," which he recognized and knew, rightfully giving him a command; and, if instead of heeding, he showed fight, fought, and killed the sheriff, he would be guilty of murder. Ezzell v. State, 13 Ala. App. 156, 68 So. 578, and authorities therein cited.

■ It was error, and we think prejudicial, for the trial court to charge the jury, orally, as he did, "If you find yourself convinced beyond a reasonable doubt and to a moral certainty that the defendant fired the first shot, then there is no self defense."

Whether or not this is a charge "upon the effect of the testimony," in contravention of the terms of Code 1923, § 9507, we need not decide, because we are of the opinion the said excerpt is erroneous in that it leaves out of consideration, altogether, the testimony of the appellant that "there wasn't a word spoken," etc. If his testimony were to be believed, etc., by the jury, there was an entire absence of anything to inform him in any

way, or to put him on notice, that the men "throwing the flash-lights on him," etc., were officers of the law, or that anything other than an unlawful assault was being made upon him etc. In this situation his right to invoke the doctrine of self-defense upon his trial could not be narrowed down to the bare proposition of whether or not he "fired the first shot." Presley v. State of Fla. supra; Ezzell v. State, supra; Brown v. State, 109 Ala. 70, 20 So. 103.

■ We see nothing in the evidence requiring the trial court to give to the jury appellant's written charge B as to the law governing manslaughter in the second degree. Under no phase of the testimony could appellant be guilty of that specific crime.

■ Merely "reserving an exception" to the court's failure to so charge the jury, orally, presents nothing for our consideration. De Arman v. State, 71 Ala. 351.

■ We are of the opinion, and hold, that appellant's written, requested charge 3 should have been given to the jury—this for the reason that it states a correct legal proposition and is applicable to this case in that the evidence to the effect that a ball from a pistol shot by appellant *actually* was the one that struck and killed the deceased *is* circumstantial to an extent. Gilmore v. State, 99 Ala. 154, 13 So. 536.

■ Appellant having been convicted of the offense of murder in the *second* degree—thus being acquitted of the higher offense of murder in the *first* degree—the refusal of written charges bearing solely upon the said higher degree will not be considered by us. De Arman v. State, supra.

■ Appellant's written, requested charge 38, not to say it did not have other defects, sought to submit a question of law to the jury, and hence was properly refused.

■ The question to the witness Marshall Owens, the deputy sheriff, as to the occasion of his going over there—meaning over to the home of appellant—called for irrelevant testimony, and the objection to same was erroneously overruled. Nothing that the said deputy or the sheriff had "heard" would be a justification for their, or either of them, going, without a search warrant or other warrant, upon the private premises of appellant—if they *did* so go upon his premises—to "watch," or for any other purpose shown. Section 5 of our Bill of Rights (Const. 1901) was meant to forever prevent just such conduct.

We may not have treated every ruling properly before us for review, but we believe that what we have hereinabove said will serve as a sufficient guide on another trial.

The other exceptions growing out of the taking of testimony seem to us to involve no novel or intricate questions of law. Whatever we might hold would be governed by the decisions of the Supreme Court (Code 1923, § 7318), and it is obvious that there are many of same as accessible to the trial court as to us, dealing with the questions raised by these other exceptions. Now that attention has been called to same, we are sure that, if he has not done so on this trial, the learned trial judge will be governed by these decisions upon another trial. So comment, or decision, by us, at this time, would be useless.

Lest we be misunderstood, we will undertake a short capitulatory generalization, viz.: If deceased and Owens were upon the private premises of appellant to "watch and see whether he was violating the prohibition law," or for any other purpose disclosed by the evidence, they were, it being undisputed that they had no warrant, etc., to that extent trespassers. But, appellant being, by his own admission, at the time engaged in the commission of a misdemeanor, to wit, carrying in his hand a gallon of whisky, in the *presence* of said officers, it was their privilege (Code 1923, § 3263) and their duty (Code, § 4643, supra) to arrest him, and/or to seize said whisky.

■ No private misdeed—such as the trespass mentioned above—of the regularly constituted sheriff of a county does, or can, divest him of the powers of his office in such sort that before he can perform the functions of same he must retreat, back off, and come back a second time. He represents, in the execution of the law, the interest of *all* the people, and should *act* where action is necessary and proper. His conduct in trespassing upon the *property* of one situated as appellant is a *private* wrong, subject to private redress, which the law affords. But, inevitably, securing *redress* is difficult, where the injured party is found in the act of violating the criminal laws of the state.

■ If the witness Owens, the deputy sheriff, addressed to appellant the command, "All right 'C' we've got you, give us that liquor," and appellant heard the words, it was his duty to submit, because he says he *knew* Owens' voice, and all residents of the county are conclusively presumed to know the regularly constituted (such as Owens) deputy sheriffs of said county. Even if he had denied knowing Owens' voice, it would have been a question for the jury to answer, in the light of Owens' testimony as to acquaintance, association, etc., with appellant, as to whether or not, in fact, appellant *did* know and recognize Owens' voice, and hence, Owens.

If appellant refused to submit, but fought, and shot, and killed, the deceased, his crime is murder—no less—whether murder in the first degree or second, we need not discuss, since he has been acquitted by the jury of the higher degree.

Neither need we discuss what *would* have been the situation had the officers involved had no knowledge, etc., of the fact that appellant· was at the time engaged in the commission of a misdemeanor. Cobb v. State, 19 Ala. App. 345, 97 So. 779; West v. State, 22 Ala. App. 187, 114 So. 568. He *was* so engaged; his arrest, etc., was attempted *for* the offense which he was at the time committing in the presence of the officers; they had reasonable and probable cause for believing he had whisky in the jug they saw; and we think, and hold, that, under the reasoning and holding of our Supreme Court in the case of Tranum v. Stringer, supra, the officers were *not* undertaking to make an illegal arrest, i. e. of course, if they, or ·either of them, were known to appellant, *actually* known, as by his recognizing the voice, etc., of Owens, at the time. See Jones v. State, 100 Ala. 88, 14 So. 772. One actively, actually, and presently engaged in a violation of the law will not be heard to quibble as to whether the officers attempting to arrest him for the very offense which he is committing in their presence, positively, and to a mathematical certainty *knew* that he was so engaged.

To be sure, if the jury should believe appellant's testimony that "no word was spoken," etc., by these officers, or either of them, but that they threw their flash-lights on him, etc., all as *he said*, whether they shot, or not, we think, there being nothing other from which it could be said that appellant knew of the presence and purpose of the said officers, the law that would apply to him would be, not that he was guilty if he "shot first," but that he would have been justified in shooting if "the appearances of danger surrounding him at the time were such as to produce a reasonable belief in his mind that his life was in danger, or that he was about to suffer great bodily harm," and that nothing short of shooting, in the way of resistance, would have been effective to protect himself. Authorities hereinabove cited.

For the errors pointed out, the judgment is reversed, and the cause remanded.

Reversed and remanded.